Christian, J.,
delivered the opinion of the court.
These cases are before us upon writs of supersedeas to *304 judgments of the Circuit court of Buckingham county. Involving precisely the same questions of law, between ' the same parties, they were heard together in this court.
They were actions of debt upon three several bonds falling due at different times, one for $1,000, payable one day after date, and the other two for $1,750 each, payable one twelve months after date, and the other two years afterdate, and all bearing date 30th December 1862.
The defendant in each case pleaded payment, and insisted upon scaling the amount of his obligation in each case in accordance with the recognized scale of depreciation of Confederate treasury notes as compared with gold as a standard of value. There was a verdict and judgment in each case for the amount of the bonds respectively, with interest from the respective days of their maturity.
A motion was made by the defendants “to set aside the verdicts and judgments which motion was overruled. But no bills of exception were taken to the judgment of the court overruling said motions, and there were no certificates of facts proved on the trials made by the court.
The only bill of exception taken in each case, was the following: “ Be it remembered, that after the j ury were sworn to try the issue joined, the plaintiff, to maintain the issue on his part, gave in evidence to the jury the single bill in the plaintiff’s declaration mentioned, in the woi’ds and figures following, to witand then follows a copy of the bonds respectively sued upon : and then the plaintiff rested his case. And thereupon, the defendant, to maintain the said issue on his part, gave evidence to the jury, tending to show that, in the year 1862, he had purchased from the plaintiff a certain property in the county of Rockingham, known as the Bellefont Mill property, for $7,000 ; that he paid on the. 30th December 1862, the-sum of $2,500, in Confederate States treasury notes, and on the same day gave his *305 single bills for the deferred payments, to wit: one for $1,000, payable one day after date, one for §1,750, payable twelve months after date, and one for §1,750, payable two years after date, with interest from their respective dates ; and also evidence tending to show that the property was worth, at the time of sale, about §4,000.
Defeudaut also gave in evidence to the jury, to show that the said sale was for Confederate States treasury notes, and that the said single bills were to be paid in Confederate States treasury notes.
"Whereupon, the counsel for the defendant moved the court to instruct the jury as follows: “If the jury believe from the evidence, that, according to the true understanding and agreement of the parties, the bonds on which these suits are brought were to be paid in Confederate States treasury notes, or were entered into with reference to such notes as a standard of value, they shall reduce the nominal amount of said bonds to their true value, at the time they were made or entered into, or to their value at such other time as the jury may think right.” But the court refused to give this instruction, and in lieu thereof gave to the jury the following instruction: “If the jury believe from the evidence, that the bonds in question were executed for the purchase of land, and that such contract was according to the true understanding and agreement of the plaintiff and defendant, to be fulfilled or performed in Confederate States treasury notes, or was entered into with reference to such notes as a standard of value, the same shall be liquidated, by reducing the nominal amount due and payable under such contract, to its true value at the time they were respectively, made and entered into, or at such other time as to . the jury may seem right in the case. Or if the jury believe, under all the circumstances, the fair value of the property sold, would be the most just measure of recovery, they may adopt such *306 value as the sum which the plaintiff is entitled to recover ; but the jury cannot find an amount greater than claimed in the plaintiff’s declaration.” To the refusal of the court to give the instruction asked by the defendant, and the giving in lieu thereof the instruction above recited, the defendant excepted. This is the only error assigned in the petition for a supersedeas ; and this bill of exception involves the true construction of the first and second sections of the act passed 3rd March 1866, providing for the adjustment of liabilities arising under contracts made between the 1st day of January 1862, and the 10th day of April 1865, and the amendments to that act, passed February 28th, 1867.
It will be observed that the instruction given adopts the precise language of the amended act; w'hile that asked for by the defendant’s counsel is confined to the original act. The one is propounded upon the theory that where the contract is to be paid in Confederate States treasury notes, or was entered into with reference to such notes as a standard of value, the only measure of recovery (whether the consideration was for the purchase, or renting, or hiring of property or not) is the reduction of the nominal amount to its true value according to the gold standard. The other (the instruction given by the court), asserts the proposition that the gold standard is not the only measure of recovery. But if the consideration of the contract was property, then the value of the property sold might be adopted as the sum to be paid, if under all the circumstances the jury shall believe that to be the most just measure of recovery.
Which one of these two propositions is right, depends upon the construction to be given to the act referred to, and the amendments to that act.
The preamble to the first act expresses in forcible language the urgent and manifest necessity for its passage, and affords a safe light to guide us in its construction. It is in these words : “ Whereas a depreciated currency, *307 known’ as Confederate States treasury notes, constituted the only or principal currency in the greater part of this State during the late war ; and whereas the result of said war involved the total destruction of said currency ; and whereas there are many contracts which were made, or obligations which were incurred, before the termination of said war, predicated on said depreciated currency, still remaining wholly or partially unadjusted, in respect to which great uncertainty exists, perplexing alike to debtor and creditor, as to the present measure of their liabilities . and rights respectively ; and it thus appearing useful that some uniform and equitable rule should be established for the adjustment of such mutual demands and liabilities, therefore he it enacted,” &c.
The first section of the act then provides that where the contract between the parties was made and entered into between the first day of January 1862, audthe 10th day of April 1865, it should he lawful for either party to show by parol or other relevant testimony, what ^ras the true understanding and agreement of the parties in respect to the kind of currency in which the contract was to be fulfilled, or performed, or with reference to which, as a standard of value, it was made and entered into.
The second section of said original act provides that whenever it shall appear that the contract, according to the true understanding and agreement of the parties, was to he fulfilled or performed in Confederate States treasury notes, or was made and entered into with reference to said notes, as a standard of value, the same shall be liquidated and settled by reducing the nominal amount to its true value at the time they were respectively entered into, or at such other time as to the court may seem right in the particular case.
Sudh was the act as originally framed and passed. But experience soon proved, that in many cases, the mode herein adopted was an inequitable adjustment of the mutual rights and liabilities growing out of such con *308 tracts. In all cases where there was a borrowing and lending of Confederate money, the rule of adjustment ' adopted by the Legislature, in the original act, was equitable, and without exception. But numerous cases arose in the courts, where the contract grew out of a sale, or renting or hiring of property, when it became manifest that the adjustment of the rights and liabilities of the parties by scaling the obligation from its nominal to its real value in gold, did not meet the plain object of the act, and the requirements of justice and fair dealing. It was found in many cases of this class, where possession and title of the property had been delivered and transferred upon an obligation to pay Confederate money, that the nominal price, when reduced to its real value, was so inadequate as compared with the value of the consideration received, as to shock the conscience and work the grossest injustice. This grew out of the fact that the purchasing value of Confederate money was much greater than its value as compared with gold, which had ceased to be a circulating medium, and was indeed a commodity ; and in many cases parties w?ere found in the possession of real and personal property for which they had never paid a dollar, but had only given their obligations solvable in Confederate currency ; or entered into with reference to that currency as a standard of value. If the legislative rule of adjustment was to prevail in all cases, by simply reducing the nominal value to its real value in gold, the defendant would be permitted in such cases, to retain possession of property, and have the title confirmed in him, by paying often times, one-tenth part of its real value at the time the contract was entered into. It was to prevent this injustice, so apparent, and so shocking to every sense of right, that the Legislature amended the original act by the act passed February 28th, 1867. In this last act they introduced what experience had everywhere made manifest, as a more equitable mode of adjustment, and a better criterion of the mea *309 sure of recovery ; and that was that where the cause of action grows out of a sale, or renting, or hiring of property, real or personal, if the court or the jury (if it he a jury ease) shall think that, under all the circumstances, the value of the property shall he the most just measure of recovery, it may adopt that value as the measure of recovery, instead of the expressed terms of the contract. So that, as the law now stands, there are two modes of adjusting rights and habilites under Confederate money contracts : two modes, in other words, of ascertaining the value of Confederate money ; one, by reducing the nominal value to the real value in gold, according to the scale of depreciation of Confederate States treasury notes, and the other by taking evidence of the real value of the thing, which the amount of Confederate States treasury notes, agreed to be paid, purchased at the time of the contract. Did a certain amount in such currency purchase a horse, or tract of land, or other property real or personal ? Then that amount toas loorth the value of that horse, or that tract of land, or that other property, real or personal, whatever it may be at the time of the purchase and delivery of the property. Which of these modes is the “ most just measure of recovery” will depend upon the circumstances of each particular case. And it is for the court (or the jury, if it be a jury case,) to adopt the one or the other, according to the circumstances of each case, vhich will best promote the ends of justice and fair dealing. Both are modes of ascertaining the value of Confederate money. Where the consideration of the contract is the borrowing and lending of Confederate currency, then the only mode of ascertaining it's value is the reduction according to the scale of depreciation, of the nominal value, to its real value in gold. But generally, where the consideration of the contract is property sold and delivered, rented or hired, then the best mode of adjustment, and the best mode of ascertaining the value of the Confederate cur *310 rency agreed to be paid, is the fair value of the property which that amount of Confederate currency bought, rented of hired at the time the contract was entered into.
This, we think, is a fair construction of the two acts under consideration. It is proper to notice (and this will fully answer one of the positions taken by the learned counsel for the plaintiff in error), that the amendment contained in the proviso to the 1st section was manifestly intended to be an amendment to the 2nd section of the original act.
This was no doubt a clerical error in appending the proviso containing the important and radical amendment, to the 1st instead of the 2nd section. It ought properly to have been inserted in the eleventh line of section 2nd, after the words “in the particular case,” in order to carry out the manifest legislative intent, and the scheme of adjustment adopted. In construeing statutes the leading object will always be to carry out the manifest legislative will and intent, and if it be necessary for that purpose the courts will not only transpose sentences, but re-arrange sections. This has been done even in criminal cases, by this court, in the construction of statutes regulating criminal trials, where the greatest strictness of construction is required. Matthew’s case and Garner’s case, 18 Gratt. 989.
It is only necessary to read the act amending the act of March 1866, to conclude that the amendment referred to was intended as a proviso to the second section, and not to the first, where it has been incorporated manifestly by mistake. The proviso referred to is not applicable to the 1st section, because that' section simply authorizes the introduction of parol or other relevant testimony, to show what was the true understanding and agreement of the parties in respect to the kind of currency in which the contract was to be fulfilled or performed, but makes no pro vision as to the measure of re *311 eovery, or mode of adjustment. This latter is provided for in the 2nd section ; and the proviso containing the amendment, must be read as if incorporated in the - 2nd section instead of .the first. Heading the amendment as applied to the 2nd section, it carries out the manifest intention of the Legislature in providing another mode of adjustment, and measure of recovery, which experience demonstrated to be necessary ; to wit, the actual value of the property.
But it is insisted by the learned counsel for the appellee, that the construction of the two acts of the legislature would be “ to enable the jury to make a new contract, to fix a new price and a new standard of value for the parties, while they were contracting with reference to Confederate notes as a standard of value.” We do not think the objection is well taken. It must be remembered that, in the abnormal and perplexing condition of things in which the close of the war found the people of this State, legislation was absolutely necessary to adjust the rights and liabilities of creditors and debtors growing out of dealings with respect to a currency which perished with the fall of the Confederacy. For four years and more the Confederate States treasury notes were the only currency of the country. Contracts during that period were for the payment of that currency, or were predicated on that currency, which had greatly depreciated. Many of these contracts remained unadjusted at the close of the war, when that currency had perished; and the perplexing aud all-important question wras, how were they to be adjusted.
The legislative department of the government, directly representing the people, and knowing their wants, presented a plan of adjustment in the act of the 3rd March 1866. It being found by experience that this plan of adjustment, while it settled upon equitable principles many cases arising during the war, did not in others meet the full measure of justice and equity between the *312 contracting parties, the amendment referred to, passed February 28th, 1867, was adopted. It has been acted ■ upon by the courts ever since, and in the opinion of this court presents the very best and most equitable plan of adjustment that could be adopted. It does not make a new contract for the parties. The literal'performance and fulfillment of a contract to pay Confederate currency would be to produce that currency, now worthless trash. That would violate not only manifest principles of justice, but the intention of the parties ; and that would indeed be a new contract for them, for they intended to pay and receive some value. What is the measure of that value the legislature has declared in the act we are now considering. So far from making a new contract, it simply provides (in the unprecedented condition of things growing out of the utter annihilation of the whole currency of the country) a just and equitable mode, by which such contracts, made with reference to a currency that has perished, may now be fulfilled and performed.
In the case before us the facts are not certified, and we have no means of ascertaining which of the two modes indicated by the statutes we have been considering would be the most just measure of recovery in this particular case ; but we are constrained to say that there was no error in the instruction given by the court, which was couched in the very language of the statute.
We are therefore of opinion that the judgment of the Circuit court of the county of Rockingham ought to be affirmed.
Judgments affirmed.